UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

JP MORGAN CHASE BANK,
in its capacity as Administrative Agent
under the Credit Agreement,

      Plaintiff,

-v-

GARY WINNICK, DAN J. COHRS,
LODWRICK M. COOK, HANK MILLNER
JAMES C. GORTON, JOSEPH CLAYTON,
THOMAS J. CASEY, S. WALLACE
DAWSON JR., SUSAN DULLABH,
THOMAS ROBERSHAW, DAVID A WALSH
JOSEPH P. PERRONE, ROBIN WRIGHT,
PATRICK JOGGERST, BRIAN
FITZPATRICK, DAVID CARREY,
JACKIE ARMSTRONG, MARK ATTANASIO,
DAVID L. LEE, GEOFFREY J. W. KENT,
ERIC HIPPEAU, NORMAN BROWNSTEIN,
WILLIAM E. CONWAY, JR.,

      Defendants.

------------------------------------------------------------x

03 Civ. 8535 (GEL)

**OPINION AND ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/16/05

Michael L. Hirshfeld, Andrew E. Tomback,
Allan S. Brilliant, Millbank, Tweed, Hadley &
McCloy LLP, New York, New York <u>for Plaintiff
JP Morgan Chase as Administrative Agent</u>.

Ralph C. Ferrara, Jonathan E. Richman, LeBoeuf,
Lamb, Greene & MacRae LLP, New York, New York,
Colby A. Smith, Jeffrey A. Alberts, Debevoise
& Plimpton LLP, New York, New York <u>for
Defendant Jackie Armstrong</u>.

Edward M. Spiro, Morvillo, Abramowitz, Grand,
Iason & Silberberg, P.C., New York, New York <u>for
Defendant James C. Gorton</u>.

GERARD E. LYNCH, District Judge:

Plaintiff JP Morgan Chase Bank brings this action on behalf of a syndicate of commercial banks ("the Banks") against various officers, directors, and employees of telecommunications company Global Crossing Ltd. ("GC") in connection with a series of loans extended to GC between August 17, 2001, and September 28, 2001, pursuant to a credit agreement entered into in August 2000 (the "Credit Agreement"). Certain defendants previously moved for dismissal of, or in the alternative, for summary judgment against, the plaintiffs' claims. The motion to dismiss was granted as to plaintiffs' negligent misrepresentation claims (fifth, sixth, and seventh causes of action), and denied as to plaintiffs' fraud claims (first through fourth causes of action), while the motion for summary judgment on the surviving claims was denied. See JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393 (S.D.N.Y. 2004).[1] Individual defendants Jackie Armstrong and James C. Gorton now move separately to dismiss plaintiffs' third (aiding and abetting fraud) and fourth (conspiracy to commit fraud) claims as against themselves.

Details of plaintiffs' allegations of fraud are set forth in this Court's prior opinion. Id. at 396–97. Briefly stated, the Credit Agreement authorized GC to draw down funds from a credit facility, provided a GC officer certified that the company was in compliance with the covenants and other terms of the Credit Agreement at the time of each borrowing. Compliance, in turn, was measured in part by GC's maintenance of a low ratio of debt to earnings ("Total Leverage Ratio"). The Banks allege that GC artificially kept the Total Leverage Ratio within bounds by

---

[1] The Court dismissed plaintiffs' seventh cause of action as to all defendants, not just those who joined in the motion. Accordingly, the seventh cause of action has already been dismissed against Armstrong and Gorton, and the only surviving causes of action against these defendants are plaintiffs' third (aiding and abetting fraud) and fourth (conspiracy to commit fraud) claims.

inflating its earnings through bogus swaps with other telecommunications providers for capacity on their respective fiber-optic networks. These swaps typically involved the sale of capacity to another provider in exchange for that provider's agreement to purchase capacity from GC of an equivalent stated value, thus permitting GC to book revenue (and deflate the Total Leverage Ratio through increased earnings) from the sale, even though the capacity purchased was unnecessary and the income generated by the sale was wholly artificial. The Banks allege that inclusion of this artificial income in GC's earnings rendered GC's certifications of compliance with the Credit Agreement false, perpetrating a fraud on the Banks in that they were deceived into permitting GC to draw down funds to which they were not entitled.

For the sake of these motions, Armstrong, in-house counsel at GC (Compl. ¶ 33), and Gorton, GC's then-general counsel (id. ¶ 21), concede that the Banks have adequately alleged a fraud in connection with the transactions and representations described above. But these defendants move to dismiss the Complaint for failure to adequately allege the claims against them with the particularity required under Fed. R. Civ. P. 9(b). The motions will be denied.

## DISCUSSION

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the Complaint and view them in the light most favorable to the plaintiff, drawing all reasonable inferences in its favor. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996).[2] Beyond the facts in the Complaint, the Court may consider "any written instrument

---

[2] Armstrong argues that on a motion to dismiss a fraud plaintiff is entitled to only the "most plausible of competing inferences," instead of the ordinary Rule 12(b)(6) standard of "all reasonable inferences" where allegations of scienter subject to Rule 9(b) are concerned. (Armstrong Reply Mem. 2.) In support of this proposition, Armstrong cites to Bond Opportunity Fund v. Unilab Corp., No. 99 Civ. 11074 (JSM), 2003 WL 21058251, at *3 (S.D.N.Y. May 9,

attached to it as an exhibit or any statements or documents incorporated in it by reference."

Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).

Ordinarily, a complaint will not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle

---

2003), in which Judge Martin employed the reasoning of the Sixth Circuit that the "strong inference" of scienter standard of the Private Securities Litigation Reform Act (PSLRA) "significant[ly] strengthen[s] . . . the pre-PSLRA standard under Rule 12(b)(6), which gave the plaintiff the benefit of all reasonable inferences," and thus permits plaintiffs only the "most plausible of competing inferences." Helwig v. Vancor, 251 F.3d 540, 553 (6th Cir. 2001) (internal quotation marks omitted); accord, Rosenzweig v. Azurix Corp., 332 F.3d 854, 867 (5th Cir. 2003) ("[T]he PSLRA's pleading standards explicitly contemplate [weighing of competing facts] by requiring the district court to determine whether or not the facts support a 'strong inference' of scienter."); Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002) ("District courts should consider all the allegations in their entirety, together with any reasonable inferences [including inferences unfavorable to the plaintiffs] that can be drawn therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter."). But see Pirraglia v. Novell, Inc., 339 F.3d 1182, 1187–88 (10th Cir. 2003) (following Gompper in so much as "plaintiff's suggested inference [must be evaluated] in the context of other reasonable inferences that may be drawn," but rejecting Helwig in stating that "[i]f a plaintiff pleads facts with particularity that, in the overall context of the pleadings, including potentially negative inferences, give rise to a strong inference of scienter, the scienter requirement of the [PSLRA] is satisfied"); Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002) (claiming to be in accord with Helwing, but holding that "[e]ven under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter.").

While the Second Circuit has equated its "strong inference" requirement under Rule 9(b) with that contained in the PSLRA, see, e.g., Novak v. Kasaks, 216 F.3d 300, 309–10 (2d Cir. 2000), it has not addressed itself to what, if any, impact the PSLRA or Rule 9(b) have on the inferences permissible on a motion to dismiss. But this Court can detect no move away from permitting fraud plaintiffs all reasonable inferences. The Court of Appeals continues to recite and rely on this standard, including in cases discussing the intersection of Rule 9(b) and PSLRA pleading requirements. See, e.g., Kalnit v. Eichler, 264 F.3d 131, 137–38 (2d Cir. 2001). The Court finds no contradiction between permitting all reasonable inferences to be drawn in favor of the plaintiff, and yet requiring that these inferences of scienter be sufficiently strong to satisfy Rule 9(b). Accordingly, this Court will rely on the Rule 12(b)(6) standard and the inferences it permits in deciding this motion. Accord In re Philip Services Corp., No. 98 Civ. 0835 (MBM), 2004 WL 1152501, at *9 n.6 (S.D.N.Y. May 24, 2004); In re Initial Public Offering, 241 F. Supp. 2d 281, 332 (S.D.N.Y. 2003).

him to relief." Conley v. Gibson, 355 U.S. 41, 45–46 (1957). But where, as here, claims based on allegations of fraud are concerned, some courts have applied the heightened pleading requirements of Fed. R. Civ. P. 9(b). See, e.g., Filler v. Hanvit, Nos. 01 Civ. 9510 (MGC) and 02 Civ. 8251 (MCG), 2003 WL 22110773, at *3 (S.D.N.Y. Sept. 12, 2003) ("Plaintiffs' claims of aiding and abetting common law fraud and conspiracy to defraud are subject to the same pleading requirements under Rule 9(b) as their claims of common law fraud.").[3] This heightened pleading standard serves three functions: (1) enabling a defendant to identify the allegedly fraudulent behavior in order to mount a defense with regard to those actions; (2) protecting defendant by prohibiting a complainant from making character-damaging allegations that have no basis in provable fact; and (3) reducing the number of strike suits. See Di Vittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987). On this view, a Complaint may also be dismissed for failure to state "the circumstances constituting fraud . . . with particularity," Fed. R. Civ. P. 9(b), although "malice, intent, knowledge, and other condition of mind of a person may be averred generally," id., provided a factual basis is pled "which gives rise to a 'strong

---

[3] The Banks claim that Rule 9(b) does not apply to conspiracy to commit fraud claims because conspiracy claims are "properly measured under the more liberal pleading requirements of Rule 8(a)," "apart from the underlying acts of fraud." Andre Emmerich Gallery, Inc. v. Segre, No. 96 Civ. 889 (CSH), 1997 WL 672009, at *8 (S.D.N.Y. Oct. 29, 1997), quoting Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 26 n.4 (2d Cir. 1990) (conspiracy to commit RICO violations). The Second Circuit in Hecht noted, however, that Rule 8(a)'s applicability notwithstanding, "the [c]omplaint must allege some factual basis for a finding of a conscious agreement among the defendants." Id. Perhaps because of the difficulty of parsing which elements of a conspiracy to commit fraud claim do not relate to the underlying fraud, courts in this district have applied Rule 9(b) to conspiracy to commit fraud claims. See, e.g., Filler, 2003 WL 22110773, at *3; Spira v. Curtin, No. 97 Civ. 2637 (TPG), 2001 WL 611386, at *3 (S.D.N.Y. June 5, 2001). The Court need not reconcile these differing approaches. Since the allegations in the Complaint as to conspiracy to commit fraud satisfy the heightened standard of Rule 9(b) applying the lesser standard of Rule 8(a) would lead to an identical result.

inference' of fraudulent intent." Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990). Moreover, the Complaint must aver with the required particularity the specific, alleged participation of each defendant against whom a fraud claim is pressed. Di Vittorio, 822 F.2d at 1247.

I. Aiding and Abetting Fraud

To establish liability under New York law for aiding and abetting fraud, the Banks must prove: "(1) the existence of a fraud; (2) a defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Filler, 2003 WL 2210773, at *2, citing Wight v. Bankamerica Corp., 219 F.3d 79, 91 (2d Cir. 2000). On this motion, Armstrong and Gorton concede that the Banks have adequately alleged a fraud, but dispute the adequacy of the allegations as to the second—knowledge—and third—substantial assistance—elements.

A. Actual Knowledge

The knowledge requirement of an aiding and abetting fraud claim is satisfied by alleging actual knowledge of the underlying fraud.[4] See Kolbeck v. LIT America, Inc., 939 F. Supp. 240,

---

[4] The Banks and Armstrong skirmish over whether anything less than actual knowledge suffices to make out a claim for aiding and abetting fraud. In addition to their briefing on the issue, the Court has received two letters from counsel for Armstrong and one from counsel for the Banks. Counsel for Armstrong initially wrote to draw the Court's attention to a recent opinion postdating the briefing on the motion and stating the actual knowledge standard for aiding and abetting fraud. See In re WorldCom, Inc. Securities Litigation, Nos. 02 Civ. 3288 and 02 Civ. 8981, 2005 WL 701092, at *8 (S.D.N.Y. Mar. 29, 2005). (Letter of Jonathan E. Richman, dated April 1, 2005, at 1–2.) The Banks responded to clarify their position that they had alleged actual knowledge (citing to Armstrong's testimony before the SEC in its investigation of Qwest Communications), but also to point to language in another recent opinion, Osrecovery, Inc. v. One Groupe Int'l, 354 F. Supp. 2d 357, 378 (S.D.N.Y. 2005), which would appear to support their alternative position that conscious disregard or recklessness would also satisfy the knowledge requirement. (Letter of Andrew E. Tomback, dated April 22, 2005, at

246 (S.D.N.Y. 1996) ("New York courts and federal courts in this district have required actual knowledge"); see also In re WorldCom Inc., 2005 WL 701092, at *8; Filler v. Hanvit Bank, 339 F. Supp. 2d 553, 557 (S.D.N.Y. 2004); Steed Fin. LDC v. Laser Advisers, Inc., 258 F. Supp. 2d 272, 282 (S.D.N.Y. 2003); Renner v. Chase Manhattan Bank, No. 98 Civ. 926 (CSH), 2000 WL 781081, at *5 (S.D.N.Y. June 16, 2000), aff'd by summary order, 85 Fed. Appx. 782 (2d Cir. 2004). As to both Armstrong and Gorton, the Banks have adequately alleged facts giving rise to a strong inference of actual knowledge regarding the underlying fraud.

First, the specific allegations against Armstrong and Gorton are made in the context of an underlying fraud, which the Banks have alleged was massive, and the objectives and mechanics of which they likewise allege were widely known within GC. The Banks allege that GC management pressured employees to meet quarterly revenue targets by "clos[ing] any and all

---

1–2.) Counsel for Armstrong then replied to correct what he perceived as the Banks' mischaracterization of her SEC testimony, submitting a full transcript of that testimony, as well as to suggest that Osrecovery misreads New York law. (Letter of Jonathan E. Richman, dated April 25, 2005, at 1–4.) Counsel for Armstrong also objected to the Court's consideration of the SEC testimony (unless the Court were to dismiss the Banks' claims with prejudice), which the Banks did not reference in their Complaint, and which he thus contends is not properly within the record on a motion to dismiss. (Id. at 2.)

The Court need not resolve the question of whether to consider the SEC testimony, because, for reasons stated below, the Court finds that the Banks' Complaint adequately alleges facts giving rise to an inference of Armstrong's actual knowledge. Moreover, it is clear that actual knowledge, and not recklessness, is the controlling legal standard. The "knowledge" element of an aiding and abetting fraud claim is not identical to the scienter required for the underlying fraud claim. And while the latter may be adequately alleged under Rule 9(b) by providing a factual basis which give rises to a "strong inference" of fraud, including "facts that constitute strong circumstantial evidence of . . . recklessness," Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1128 (2d Cir. 1994), the weight of the case law, cited above, defines knowledge in the context of an aiding and abetting claim as actual knowledge. The language of Osrecovery, 354 F. Supp. 2d at 377–78 ("[The facts alleged in connection with an aiding and abetting fraud claim] tend to show conscious disregard or recklessness and give rise to a strong inference of fraudulent intent. Accordingly, the Complaint sufficiently alleges [defendant's] knowledge of the primary wrongdoing."), is inconsistent with the prevailing judicial opinion.

possible deals, even if they had to be reciprocal, even if they would not be profitable or beneficial to [GC], and even if [GC] had no defensible business purpose for acquiring the additional capacity," (Compl. ¶ 172) and that by early 2001, many within GC were already expressing concern about reliance on swaps. (Id. ¶ 181.) The network engineers in particular had to be "sold" on the strategy because their help was needed in supplying post-hoc "business cases" (*i.e.*, "tool[s] prepared by sales, marketing, technical, finance, and operations people to support planning and decision-making . . . generally designed to analyze financial and operational consequences of a particular decision," id. ¶ 87) for the swaps that management had already approved. (Id. ¶¶ 181–189.) The relevance of meeting revenue targets to maintaining access to the credit facility provided by the Banks was also allegedly well-known: As detailed in the Complaint, emails exchanged among various defendants in May 2001 referencing the debt ratio provided for in the Credit Agreement led to the subsequent execution of allegedly improper swaps at a "frantic pace," fueled by a change in the compensation structure for "upper management paid salespeople" that rewarded swaps and straight sales in an equivalent manner. (Id. ¶¶ 228–234.) Exhortations to salespeople to simulate revenue by concluding reciprocal transactions continued and by the end of summer 2001, the Banks allege that "the lack of business purpose underlying the reciprocal transactions, the impropriety of the accounting methods employed, and [GC's] vulnerability to regulatory scrutiny, was [*sic*] well-known within the Company" (id. ¶ 288), supporting this allegation with references to emails and calls among various GC employees continuing to query or express concern about the legitimacy of the swaps (id. ¶ 288–291). Armstrong correctly notes that these allegations about what was known within the company or to other defendants can not suffice on their own to satisfy the requirement of

Rule 9(b) that allegations be pled with specificity as to each defendant. (Armstrong Mem. 9.) See Di Vittorio, 822 F.2d at 1247. Nonetheless, they do shade in the contours of those allegations pressed specifically against Armstrong and Gorton.

Second, those specific allegations, particularly when viewed against this backdrop, are sufficient to give rise to an inference of Armstrong and Gorton's actual knowledge of the fraud. Armstrong is identified in the Complaint as "Counsel at [GC] during the relevant period. Armstrong actively participated in negotiating transactions and drafting contracts for the Improper Swaps. Armstrong assisted the fraud on . . . the Banks." (Compl. ¶ 33.) While this does not provide a factual basis for Armstrong's knowledge of the fraud, the Complaint goes on to reference three emails of which Armstrong was a recipient. The emails, the full texts of which were submitted in opposition to this motion and as documents referenced within the Complaint are thus properly considered, Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993), contain language which could reasonably be understood to demonstrate Armstrong's actual knowledge of the true purpose of the swaps. The first from Robin Wright, GC's vice-president of carrier sales from 1998 through 2001 (Compl. ¶ 29), dated March 9, 2001, outlining some of the details of a Qwest swap, and copied to Armstrong, includes the following statement: "And before you say it, I know buying wavelengths is something we'd prefer not to do. We're with you. But I think we may have to do it if we are going to hit the revenue target." (Miller Decl. (Armstrong) Ex. A, at 2.) The second, dated March 12, 2001, again from Wright, and copied to Armstrong, contains similar language: "[W]e are buying waves, local loops, co-lo, whatever to come to parity. We are swapping $100M checks this quarter." (Miller Decl. (Armstrong) Ex. B, at 1.) The language of the third email, dated June 25, 2001—this time from Wright to employees

at Qwest, but again copied to Armstrong—is even more revealing: "As we've agreed, because we are both being delivered what we probably don't want in the long term, we have agreed, on both sides, that the repurchase price is the actual amount paid, not the fair market value. You both know the issue, we are taking capacity in order to help with revenue recognition issues." (Miller Decl. (Armstrong) Ex. C, at 1.) Accordingly, the Banks have not just pled that Armstrong participated in transactions which were at the core of the fraudulent scheme, but that she received emails which could be understood to have informed her, almost in so many words, of the fraud's existence.

Armstrong argues that these emails can and should be read differently. She points out that "corporations are supposed to do deals that enable them to hit their revenue targets," and argues that the third email specifying a repurchase price of actual amount paid substantiates a legitimate business case for the Qwest transaction, *i.e.*, providing GC with the option in the future of exchanging unwanted, purchased capacity for capacity it did want. Finally, she points to language in yet another email in which she explains this as her understanding of the business purpose of the Qwest transaction. (Armstrong Reply Mem. 6–7; Miller Decl. (Armstrong) Ex. F, at 2.) Perhaps Wright's three emails can and will be read by the factfinder in the manner suggested by Armstrong, but at this early stage of the litigation it is sufficient that they can also be read to inform her of the fraudulent purpose of the transactions. A more substantial factual basis is not required to give rise to a strong inference of Armstrong's actual knowledge.[5]

---

[5] Armstrong argues in the alternative that the Banks' claims should be dismissed as to her with regard to all non-Qwest transactions, given that the emails on which the Banks rely relate only to Qwest swaps. (Armstrong Reply Mem. 8 n.7.) This argument is unavailing. On a motion to dismiss all reasonable inferences are to be drawn in favor of the plaintiff, and it is not unreasonable to infer Armstrong's broader knowledge about the overall fraudulent scheme from

The Banks have marshaled an even more extensive array of facts in the Complaint which give rise to a strong inference of Gorton's actual knowledge. (P. Gorton Opp. Mem. 13–14.) Gorton argues that these facts, and particularly his receipt, as general counsel, of a letter from Roy L. Olofson, a former vice president of finance at GC, detailing the booking of swaps as cash transactions and the resulting inflation of revenue (Compl. ¶¶ 301–304), cannot support an inference of his actual knowledge. Gorton is correct that the Olofson letter, showing at most that Gorton was put on notice of potential misconduct, does not suffice; suspicion, without confirmation, does not satisfy the actual knowledge requirement for a claim of aiding and abetting fraud. See Ryan v. Hunton & Williams, No. 99 Civ. 5938 (JG), 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) (allegation that defendant bank manager initiated investigation into accounts suspected as vehicles for ponzi scheme not sufficient to show actual knowledge); Renner, 2000 WL 781081, at *7–*8 (bank manager's suspicions about uses to which bank accounts were being put, and rejection of certain transactions because of suspected fraud, did not show actual knowledge of the alleged fraud).

But the Banks have alleged other facts which, taken together could show not just what Gorton should or might have known, but what he actually knew. According to the Complaint, Gorton knew about the revenue shortage and its impact on meeting the covenants in the Credit Agreement (Compl. ¶¶ 219–220, 228); he knew swaps were being conducted to meet end-of-quarter revenue targets (see, e.g., id. ¶ 176 (citing Gorton's congressional testimony about the first quarter 360Networks swap) and forwarded an email containing a list of potential swaps to be

---

her receipt of emails about particular transactions which are not alleged to be materially different from the other transactions at the heart of that scheme.

-11-

closed to "help make the $650M target" to Gary Winnick, GC founder and board of director co-chairman, adding in the text of his own message the comment "[g]iven that we are at the end of the quarter, Patrick [Joggerst, GC's president of carrier sales] rightly believes that the only deals that we should focus on at this critical moment are the IRU deals on the table" (Id. ¶ 242; Miller Decl. (Gorton) Ex. C, at 1); he knew about the need to alter compensation to incentivize GC's salespeople to close swaps (Compl. ¶ 234); and he knew a swap partner's accounting firm had balked at signing off on one swap. (Id. ¶ 294.)

Gorton argues that it would have been inconsistent for him to have been complicit in the fraud, and yet to have objected to the lack of business justification for the 360Networks swap (id. ¶¶ 176–180), to have expressed concern over changing the structure of sales incentives (id. ¶ 234), and to have hired outside legal counsel to investigate Olofson's allegations. (Gorton Mem. 12–13; Gorton Reply Mem. 4–5.) But this is an argument for the factfinder. The Complaint adequately alleges facts giving rise to a strong inference of Gorton's actual knowledge.

B. Substantial Assistance

Plaintiffs must also plead facts describing the substantial assistance defendants provided to the fraud. "A defendant provides substantial assistance only if [she] affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed." Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., No. 98 Civ. 4960 (MBM), 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999) (internal quotation marks and citations omitted). Whether the assistance is substantial or not is measured, in turn, by whether "the action of the aider and abettor proximately caused the harm on which the primary liability is predicated." In re Worldcom, Inc., 2005 WL 701092, at *9 (citations omitted). Essentially, "[t]he substantial

assistance element has been construed as a causation concept, requiring that the plaintiff allege that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated." Primavera Familienstiftung v. Askin, 173 F.R.D. 115, 126 (S.D.N.Y. 1997).[6] Armstrong argues that the Banks have alleged very little about her participation in the fraud apart from the responsibilities she regularly carried out in her job as in-house counsel, while Gorton argues that the Banks' allegations show he was actively opposed, rather than assisted the fraud. Both arguments may ultimately prove persuasive, but do not provide justification for dismissing the Complaint against them at this early stage in the litigation.

1. Armstrong

The allegations as to Armstrong's participation in the fraud are thin. The Complaint alleges no more than that she "actively participated in negotiating transactions and drafting contracts for the Improper Swaps." (Compl. ¶ 33.) Contrary to the position they adopt in their briefing, the Banks are not entitled to rely on their additional general allegations that the "fraud defendants" encouraged or even required the use of improper swaps to inflate revenue. (P. Armstrong Opp. Mem. 16–17; Compl. ¶¶ 78, 162.) These allegations are pressed at too broad a

---

[6] This Court has some doubt about whether "substantial assistance" can be equated with proximate cause. A person can make a meaningful contribution to a fraudulent scheme without being understood to have legally "caused" the scheme or its results. In the criminal law usage from which the concept is derived, for example, one may be guilty of aiding and abetting based on conduct that would not likely be sufficient to constitute a proximate cause of the criminal result; an accomplice to murder could rarely be found guilty as a principal who himself proximately caused the victim's death. However, the Second Circuit has utilized the "proximate cause" standard in the context of aiding and abetting securities fraud. See Edwards & Hanley v. Wells Fargo Sec. Clearance Corp., 602 F.2d 478, 484 (2d Cir. 1979), superseded on other grounds, Central Bank of Denver, N.A. v. First Interstate Bank of Denver, 511 U.S. 164 (1999). In any event, for purposes of deciding this motion, since the allegations meet the "proximate cause" standard referenced in the case law, there is no need to speculate about whether a lesser showing than "proximate cause" might in another case suffice.

level to satisfy Rule 9(b)—there are seventeen "fraud defendants" (Compl. ¶ 4) and it is not clear to which subset of "fraud defendants" these particular allegations are addressed. The specific allegations against Armstrong, in contrast, make no mention of any role in inducing the transactions, but rather state her role in negotiating and papering the transactions.

Armstrong primarily argues that this role cannot be considered substantial assistance, because negotiating and drafting contracts were her typical duties as in-house counsel, and she cites cases in which tasks routinely performed in the course of business—such as maintaining bank accounts and authorizing transfers—were held not to constitute substantial assistance. See Ryan, 2000 WL 1375265, at *9 (bank's opening of accounts and approval of transfers from the bank account did not constitute substantial assistance); Renner, 2000 WL 781081, at *8 (bank manager's drafting of letter confirming bank's receipt of funds which was later used by alleged primary violator to defraud plaintiff and authorization of fund transfers did not constitute substantial assistance); Nigerian Nat'l Petroleum Corp., 1999 WL 558141, at *8 (primary violators' use of accounts did not constitute substantial assistance on the part of the bank); Williams v. Bank Leumi Trust Co., No. 96 Civ. 6695 (LMM), 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997) (same). Any finding to the contrary, she argues, would eliminate the substantial assistance element by elevating any assistance at all—including that of "[GC] mailroom staff"—to the requisite level whenever an underlying fraud is alleged. (Armstrong Reply Mem. 9.) The Banks counter this argument by suggesting that the transactions were anything but routine, in that they were concluded under substantial time pressure at the end of the financial quarter. (D. Armstrong Opp. Mem. 18–19.)

The aiding and abetting conduct alleged in the cases Armstrong cites to the Court, consisting almost entirely of the provision of banking services to account holders, is too different from the conduct alleged here to be instructive, and Armstrong's argument (and the Banks response) overstates the relevance of the whether the transactions were routine. The critical test is not, as Armstrong would have it, whether the alleged aiding and abetting conduct was routine, but whether it made a substantial contribution to the perpetration of the fraud. More instructive in this connection is the injunction of the district court in Primavera Familienstiftung v. Askin, 130 F. Supp. 2d 450 (S.D.N.Y. 2001), amended on reconsideration in part on unrelated grounds, 137 F. Supp. 2d 438 (S.D.N.Y. 2001), that "substantial assistance can take many forms . . . executing transactions, even ordinary course transactions, can constitute substantial assistance under some circumstances, such as where there is an extraordinary motivation to aid the fraud." Id. at 511–12 (collecting cases in which the context elevated ordinary transactions to the level of substantial assistance).

Far from being a remote servicer of the primary violator, Armstrong is alleged to have been directly involved in bringing about—including negotiating—transactions, which while not themselves necessarily fraudulent, are alleged to have been carried out solely for the purpose of inflating revenue and thus could reasonably be understood as a proximate cause leading foreseeably to defrauding the Banks. Whether Armstrong's actual contribution on any given transaction was sufficient to be a proximate cause of the Banks' losses is ultimately a fact issue to be resolved after fuller development of the record, but the Banks are entitled to present proof of the substantial assistance they have adequately alleged. Thus, the Banks have met their burden under Rules 12(b)(6) and 9(b) as to their aiding and abetting claim against Armstrong.

-15-

## 2. Gorton

In contrast to Armstrong, Gorton claims not that the Complaint alleges he did too little to constitute substantial assistance, but, in effect, that he did too much in direct opposition to the fraud. The Complaint is replete with references to Gorton, but in their opposing papers, the Banks rely on very little to show that Gorton substantially assisted the fraud, identifying only Gorton's attendance at meetings and receipt of emails in which the fraudulent scheme was allegedly discussed, and, as described above, his forwarding of an email to Winnick containing a list of swaps GC desired to close that quarter. (P. Gorton Opp. Mem. 15–17.) These are very thin allegations indeed, and Gorton points to the many ways in which he claims he "actively *discouraged* the allegedly fraudulent acts." (Gorton Reply Mem. 6–9, citing his vocal opposition to the 360Networks transaction; his challenge to altering the compensation scheme to reward salespeople equally for reciprocal and non-reciprocal transactions; and his initiation of an investigation, including involving outside counsel, following receipt of Olofson's letter.)

Although Gorton's attendance at meetings and receipt of emails at which or in which the fraud was discussed strongly support an inference of knowledge, they cannot suffice to show his assistance to the fraud. Mere presence, and passive receipt of email, cannot, by definition, constitute affirmative assistance. See In re Liquidation of Union Indem. Ins. Co. of New York, 736 N.Y.S.2d 1, 2 (1st Dep't 2001) (aider and abettor liability cannot be predicated on silence); cf. United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977) (affirming jury instructions that "[t]he mere presence of a defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed . . . is not sufficient to establish aiding and abetting . . . [a]n aider and abettor must have some interest in the criminal venture");

United States v. Garguilo, 310 F.2d 249, 253 (2d Cir. 1962) ("[K]nowledge that a crime is being committed, even when coupled with presence at the scene, is generally not enough to constitute aiding and abetting."). Nonetheless, the Banks have alleged that Gorton "was actively involved in the negotiation, facilitation, and approval of the Improper Swaps." (Compl. ¶ 21.) For the reasons discussed above in connection with Armstrong's motion to dismiss, this constitutes an adequate allegation of substantial assistance.

Moreover, the Banks point to one affirmative action in particular on Gorton's part which they claim constitutes substantial assistance—his solicitation of Winnick's help in closing swaps identified as crucial to making revenue targets by forwarding a list of desirable transactions, some of which were reciprocal, and accordingly the kind of transactions claimed to be at the heart of the alleged fraudulent scheme. (Id. ¶ 242; Miller Decl. (Gorton) Ex. C, at 1.) Gorton suggests that no fact of assistance can be read into Gorton's forwarding of this email, given that "a [c]ompany's desire to meet quarterly revenue projections is hardly extraordinary in American business." (Gorton Mem. 16–17.) But that a particular fact can give rise to conflicting inferences does not justify dismissing a complaint at this stage of the proceedings, provided the facts can give rise to an inference of wrongful conduct. Similarly, while Gorton points to the many steps he claims to have taken to oppose the fraud, some of these are themselves subject to conflicting inferences. As one example, although Gorton opposed the 360Networks swap, the language he used—at least as quoted in the Complaint (id. ¶ 179)—tends to show that he did so because it was risky, not necessarily because it was fraudulent. The Court need not resolve these conflicting inferences, nor decide whether the facts alleged in the Complaint ultimately prove that Gorton's actions are a sufficiently proximate cause of the Banks' losses to raise Gorton's

liability. Instead, on a motion to dismiss, it is sufficient that the Banks have set forth with particularity actions they allege constitute Gorton's substantial assistance to the fraud, and that these actions—assisting in the transactions at the core of the fraudulent scheme—are reasonably alleged to be a proximate cause of the Banks' losses. Accordingly, the aiding and abetting claim against Gorton survives his Rule 9(b) and 12(b)(6) challenge.

II. Conspiracy to Commit Fraud

The Banks also bring claims against Armstrong and Gorton for conspiracy to commit fraud. To adequately plead claims for conspiracy to commit fraud under New York law, in addition to pleading the underlying fraud, the Banks must allege the following with the required specificity as to each defendant: "(1) an agreement among two or more parties, (2) a common objective, (3) acts in furtherance of the objective, and (4) knowledge." Filler, 2003 WL 22110772, at *2. For essentially the reasons set forth above, the Banks have clearly met this burden as to both Armstrong and Gorton. Although the third and fourth elements of the conspiracy claim are not stated in precisely the same terms as the corresponding elements of aiding and abetting, the facts which sufficed to allege substantial assistance and actual knowledge of the fraud in support of the Banks' aiding and abetting claims suffice here to show acts in furtherance and knowledge of the conspiracy. Moreover, there can be no question that the extensive allegations in the Complaint concerning the interplay between the swaps, the resulting inflation in revenue the swaps permitted GC to book, and the relevance of this inflated revenue to the terms of the Credit Agreement and GC's access to the credit facility extended by the Banks are sufficient to satisfy the second element of alleging a common objective. Finally, the knowing assistance Armstrong and Gorton are alleged to have provided to the fraud gives rise to an

inference of their individual agreement to the objectives of the fraud. Accordingly, the Banks' conspiracy claims against Armstrong and Gorton also survive their motions to dismiss.

## CONCLUSION

The motions of defendants Jackie Armstrong and James C. Gorton to dismiss the Banks' claims of aiding and abetting and conspiracy to commit fraud are denied. Although the allegations in the Complaint are sufficient to survive these motions, the claims do not strike the Court as particularly potent as to these individual defendants. Many of the facts alleged in the Complaint are susceptible to conflicting interpretations and robust dispute as to whether they prove anything of much significance with regard to the knowledge and involvement of these defendants in the fraud alleged here. Moreover, it is doubtful whether these defendants can make a substantial contribution to compensating the Banks, even if their liability is ultimately established. If sufficient evidence can be mustered to survive a summary judgment challenge, the Banks would nonetheless be well-advised to consider whether chasing multiple individual defendants on what appear to be weak claims is worth the candle.

SO ORDERED.

Dated: New York, New York
      August 15, 2005

                                      GERARD E. LYNCH
                                      United States District Court Judge